**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

WELLS FARGO BANK, N.A.,        )
                                     )
                Plaintiff,     )
                                     )
                v.             )      1:22cv907
                                     )
LINCOLN NATIONAL LIFE          )
INSURANCE COMPANY,              )
                                     )
                Defendant.     )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant The Lincoln National Life Insurance Company's Motion to Dismiss" (Docket Entry 10) (the "Dismissal Motion"), as well as for an order on "Plaintiff's Motion for Leave to File an Amended Complaint" (Docket Entry 22) (the "Amendment Motion"). For the reasons that follow, the Court should grant the Dismissal Motion and will deny the Amendment Motion.

## BACKGROUND

Wells Fargo Bank, N.A., as Securities Intermediary (the "Plaintiff" or "Wells Fargo"), initiated this action against The Lincoln National Life Insurance Company (the "Defendant" or "Lincoln National"), seeking a declaratory judgment as to the validity of, and law applicable to, certain flexible premium

adjustable life insurance policies.  (See Docket Entry 1 (the "Complaint") at 1-24.)[1]

More specifically, according to the Complaint:

> This is an action for declaratory judgment with respect to four (4) flexible premium adjustable life insurance policies (collectively, the "Policies") as follows:  (1) [the] policy bearing certificate number JF-5585822 (the "Friedman Policy") issued by Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot"), a predecessor of Defendant, to the Irwin Friedman Trust dated May 1, 2007-Trust (the "Friedman Trust") insuring the life of Irwin D. Friedman ("Friedman"), in the specified amount of $8 million; (2) [the] policy bearing certificate number JJ-7042644 (the "Roscoe Policy") issued by Defendant to The Life Insurance Irrevocable Trust By And Between Corrine Roscoe and Robert Sand, Esq. Dated September 16, 2008 (the "Roscoe Trust") insuring the life of Corinne M. Roscoe ("Roscoe"), in the specified amount of $3 million; (3) [the] policy bearing policy number JJ-7066412 (the "Karmi Policy") issued by Defendant to David Karmi 2009 ILIT, Dated February 27, 2009 (the "Karmi Trust") insuring the life of David Karmi ("Karmi"), in the specified amount of $20 million; and (4) [the] policy bearing policy number JJ-7051837 (the "Sagan Policy") issued by Defendant to BCH Dundee Childrens Trust Dated January 2, 2002 (the "Sagan Trust") insuring the life of Bruce Sagan ("Sagan"), in the specified amount of $10 million.

(Id., ¶ 1.)  The Complaint further explains that:

> [Plaintiff] seeks a judgment declaring that: (a) New York law applies to determining whether the Friedman Policy is valid and enforceable and the Friedman Policy is valid and enforceable under New York law; (b) Wisconsin law applies to determining whether the Roscoe Policy is valid and enforceable and the Roscoe Policy is valid and enforceable under Wisconsin law; (c) New York or Michigan law applies to determining whether the Karmi Policy is valid and enforceable and the

---

[1]  Docket Entry page citations utilize the CM/ECF footer's pagination.

Karmi Policy is valid and enforceable; and (d) the Sagan Policy is valid and enforceable under applicable law.

(Id., ¶ 3.)

In support of those positions, the Complaint makes the following allegations:

"The Friedman Trust was created on or about May 1, 2007 with a[New York] address." (Id., ¶ 10.) "The Friedman Trust Agreement is governed by New York law" and "listed Friedman's wife, Julia Friedman, as sole trustee and beneficiary." (Id.) "Friedman stated on the Friedman Policy application of May 20, 2007 that his net worth at the time was $25 million and that he had two life insurance policies in the total face amount of $150,000." (Id., ¶ 11.) "Friedman stated that neither he nor the proposed owner of the Friedman Policy had been involved in any discussion about the possible sale or assignment of the Friedman Policy to a life settlement, viatical or other secondary market provider." (Id., ¶ 12.) "The Friedman Policy application states that it was signed in New Jersey." (Id., ¶ 13.) "The Friedman Trust was the Friedman Policy's initial owner and beneficiary and the Friedman Policy was issued to the Friedman Trust on December 28, 2007. The Friedman Trust had an insurable interest in Friedman's life because the beneficiary of the Trust was Friedman's wife, Julia Friedman." (Id., ¶ 14.)

"On or about June 11, 2008, Julia Friedman was replaced as trustee of the Friedman Trust by Friedman's nephew, Samuel

3

Friedman. At the time, Samuel Friedman resided in Brooklyn, New York." (Id., ¶ 15.) "Sometime thereafter, the Friedman Trust beneficiaries agreed to sell their beneficial interest in the Friedman Policy." (Id., ¶ 16.) "In June 2008, the beneficial interest in the Friedman Policy was transferred to The Belmont II 2007 Trust, with a situs in Delaware." (Id., ¶ 17.) "A series of ownership and beneficiary changes were processed by Jefferson-Pilot between 2008 and 2020." (Id., ¶ 18.) "On or about January 29, 2020, [Plaintiff] became the owner and beneficiary of the Friedman Policy on behalf of its customer" (id., ¶ 19), and "Jefferson-Pilot confirmed th[at] change" (id., ¶ 20).

In addition, "[t]he Roscoe Trust was created on or about September 16, 2008 with a[ New Jersey] address" (id., ¶ 23), pursuant to a trust agreement "governed by New Jersey law" (id.). "The stated purpose of the Roscoe Trust is to establish an irrevocable trust for the benefit of Roscoe's family." (Id.) "Roscoe was a resident of Wisconsin when she applied for the Policy and stated on her application of September 17, 2008 that her net worth at the time was $5.7 million." (Id., ¶ 24.) "Roscoe also stated that neither she nor the proposed owner of the Roscoe Policy had been involved in any discussion about the possible sale or assignment of the Roscoe Policy or a beneficial interest in a trust, LLC or other entity created or to be created on Roscoe's behalf." (Id., ¶ 25.) "The Roscoe Policy application states that

4

it was signed in New Jersey, but Roscoe signed it in Wisconsin."
(Id., ¶ 26.) "The Roscoe Trust was the Roscoe Policy's initial
owner and beneficiary and the Roscoe Policy was issued to the
Roscoe Trust on September 19, 2008." (Id., ¶ 27.) "The Roscoe
Trust had an insurable interest in Roscoe's life because the
beneficiaries of the Trust were Roscoe's husband[ and children]."
(Id., ¶ 28.)

"Shortly after the [Roscoe] Policy was issued, the Roscoe
Trust, as borrower, entered into a Credit Agreement with HM Ruby
Fund, L.P[.] as lender, in connection with a premium finance loan
for the Roscoe Policy. The Credit Agreement is governed by New
York law." (Id., ¶ 29.) "Roscoe personally guaranteed the premium
finance loan." (Id.) "In or around July 2011, Roscoe and the
Roscoe Trust sold the Roscoe Policy and Defendant confirmed the
change of ownership and beneficiary to [Plaintiff]." (Id., ¶ 30.)

"The writing agent for the Roscoe Policy was James Kevin
Kergil, one of three individuals prosecuted and convicted of
insurance fraud by the United States government in September 2013.
The prosecution involved participation by Defendant. Michael
Burns, an executive for Defendant who worked in Greensboro,
testified for the government." (Id., ¶ 33.) "The Roscoe Policy
was admitted at trial, and Defendant sought and was awarded
restitution from the convicted defendants in connection with the
Roscoe Policy and others that the company issued with Kergil or his

5

co-defendants as agents." (Id.) "Defendant has never provided [Plaintiff] any information about the trial or any effect the convictions would have, in Defendant's view, on the Roscoe Policy." (Id.)

Further, "[t]he Karmi Trust was created on or about February 27, 2009 with a[ Michigan] address." (Id., ¶ 34.) "Karmi's children[] . . . were the beneficiaries of the Karmi Trust, and Bank of America, N.A. was the trustee." (Id., ¶ 35.) "Karmi signed the Karmi Policy application on March 4, 2009 in Michigan and stated that his net worth at the time was $40 million and that he had a life insurance policy valued at $7 million." (Id., ¶ 36.) In addition:

> Karmi stated that neither he nor the proposed owner of the Karmi Policy had been involved in any discussion about the possible sale or assignment of the Karmi Policy to an unrelated third party as an inducement to purchase the Karmi Policy and have [sic] not been involved in any discussion about the possible sale or assignment of a beneficial interest in a trust, limited liability company or other entity created or to be created on Karmi's behalf which will have an ownership or beneficial interest in the Karmi Policy.

(Id., ¶ 37.)

"The Karmi Policy application states that it was signed in Delaware, but Karmi executed it in Michigan." (Id., ¶ 38.) "The Karmi Trust was the Karmi Policy's initial owner. The Karmi Policy was issued to the Karmi Trust on March 25, 2009." (Id., ¶ 39.) "The Karmi Trust had an insurable interest in Karmi's life because his children were the beneficiaries of the Trust." (Id., ¶ 40.)

6

"The Karmi Trust, as borrower, entered into a Loan and Security Agreement with Concord Capital Funding, LLC, as lender, in connection with a non-recourse premium finance loan for the Karmi Policy." (Id., ¶ 41.) "In or around August 2011, [Plaintiff] became the owner and beneficiary of the Karmi Policy on behalf of [Plaintiff's] customer" (id., ¶ 42), and "Defendant confirmed the change of ownership and change of beneficiary to [Plaintiff] as of August 4, 2011" (id., ¶ 43).

Finally, "[t]he Sagan Trust was created on or about January 2, 2002 with an [Illinois] address." (Id., ¶ 46.) "The Sagan Trust Agreement lists Sagan's wife, Bette Cerf Hill, as trustee" (id., ¶ 47), and its stated purpose "is creation of an irrevocable trust for the primary benefit of Bette Cerf Hill's children and the beneficiaries of the Sagan Trust are Sagan's wife's children" (id.). "The Sagan Trust Agreement is governed by Illinois law." (Id.) "Sagan stated on the Sagan Policy application of September 12, 2008 that his net worth at the time was $50 million and that he had two life insurance policies, with total face amounts of $110,000." (Id., ¶ 48.) "Sagan stated that he had not been involved in any discussion about the possible sale or assignment of the Sagan Policy or a beneficial interest in a trust, LLC or other entity created or to be created on Sagan's behalf." (Id., ¶ 49.) "The Sagan Policy application was signed in Illinois." (Id., ¶ 50.)

7

"The Sagan Trust was the Sagan Policy's initial owner and beneficiary and the Sagan Policy was issued to the Sagan Trust on October 7, 2008." (Id., ¶ 51.) "The Sagan Trust had an insurable interest in Sagan's life." (Id., ¶ 52.) "In or around November 2010, the Sagan Trust sold the Sagan Policy to Coventry First, LLC, a life settlement provider, pursuant to a Life Insurance Policy Purchase Agreement." (Id., ¶ 53.) "As a result of the sale to the life settlement provider, ownership and beneficial interest in the Sagan Policy was transferred to [Plaintiff] on behalf of its customer and Defendant confirmed the change of ownership and beneficiary at the time." (Id., ¶ 54.)

Since its acquisition of the Policies on behalf of its customers, Plaintiff has "held [each of the Policies] in a securities account for the benefit of its client and is the current record owner and beneficiary of [each of the Policies] on behalf of [the relevant] customer." (Id., ¶ 55; accord id., ¶¶ 21, 31, 44.)[2] "Since [Plaintiff] became the owner and beneficiary of [each of the Policies] on behalf of its customer, all [of the Policies'] premiums have been duly and timely paid, there are no outstanding premium payments, and [Plaintiff] on behalf of [the relevant]

_____

2  The Complaint does not clearly indicate whether the same entity owns all four Policies. (Compare, e.g., id., ¶ 61 (referencing "customers," plural), with id., ¶ 63 (indicating that "customer," singular, owns "the Policies").)

8

customer has otherwise performed all obligations under the [Policies]." (<u>Id.</u>, ¶ 56; <u>accord</u> <u>id.</u>, ¶¶ 22, 32, 45.)

However,

> [i]n the *Lincoln National Life Insurance Company v. Eli Inzlicht-Sprei et al.* (16-CV-5171) matter before the United States District for the Eastern District of New York, [Defendant] argued among other things that use of a financing arrangement involving HM Ruby Fund, L.P[.] to fund premiums on a life insurance policy rendered the life insurance policy void on the grounds that it was a stranger-originated life insurance (STOLI) policy.

(<u>Id.</u>, ¶ 57.) Moreover, "[o]n or about December 9, 2021, Defendant filed an action in the United States District Court for the District of New Jersey entitled *The Lincoln National Life Insurance Company v. Retirement Value LLC* (21-cv-20438) (the 'New Jersey Action')." (<u>Id.</u>, ¶ 58.) "In the New Jersey Action, Defendant alleges, among other things, that certain policies issued in 2007 by Jefferson-Pilot are void and unenforceable because they are illegal human life wagers constituting STOLI procured with the intent to benefit stranger investors lacking an insurable interest in the insured's life." (<u>Id.</u>)[3] "In the New Jersey Action, Defendant seeks a declaration that such Jefferson-Pilot policies are void ab initio and Defendant is not obligated to pay the

---

3 More specifically, the complaint in the New Jersey Action challenges the validity of two life insurance policies, totaling $8 million, insuring the life of an individual named Haya Majerovic. <u>See, e.g.</u>, <u>The Lincoln Nat'l Life Ins. Co. v. Retirement Value LLC</u>, No. 3:21cv20438, Docket Entry 1, ¶¶ 11-12, 33-35 (D.N.J. Dec. 9, 2021).

9

policies' death benefits to the policies' current owner and beneficiary." (Id., ¶ 59.)

In that matter, Defendant also "takes the position that New Jersey law applies to the dispute regarding the policies' validity and enforceability because, among other things, a New Jersey trust was the initial owner and beneficiary of the policies, and the policies were delivered to such New Jersey trust in New Jersey." (Id., ¶ 60.) As a result,

> [Plaintiff's] customers anticipate that Defendant will challenge the Policies' validities and enforceability, as it has done with other Jefferson-Pilot and Lincoln National policies in other actions nationwide, and will seek to apply New Jersey law to both the Friedman Policy and Roscoe Policy and Delaware law to the Karmi Policy in order to assert a right to both avoid its obligation to pay policy benefits and also to refuse to return premium paid.

(Id., ¶ 61.) "[Plaintiff] contends that New Jersey and Delaware law do not apply to disputes relating to the Friedman, Roscoe and Karmi Policies, and that each of these Policies are valid and enforceable under applicable law." (Id., ¶ 62.)

Additionally,

> [t]he Sagan Policy was purchased by a life settlement provider that has been accused in multiple lawsuits of engaging in unlawful transactions by the law firm that represents [D]efendant and [Plaintiff's] customer (the beneficial owner of the Policies) is concerned that Defendant will seek to have the Sagan Policy cancelled under Illinois law due to the involvement of the provider. [Plaintiff] contends that the Sagan Policy is lawful and valid under applicable law.

(Id., ¶ 63.)

10

"The Friedman Policy was issued by a North Carolina insurance company, acting through an agent appointed by the company to solicit and sell its policies in New York, to a New York insured in 2007." (Id., ¶ 67.) "New York law applies to the parties' dispute with regard to the validity and enforceability of the Friedman Policy as the Friedman Policy was solicited, sold and/or delivered in New York." (Id., ¶ 71.) Nevertheless, "Defendant may assert that New Jersey law governs the Friedman Policy's validity and enforceability on the ground that the Friedman Policy application indicates that it was signed by some of the signatories in New Jersey." (Id., ¶ 72.)

"Under New York law, a policy valid at the time of procurement may be assigned to one without an insurable interest in the insured's life and no insurable interest is required when one holds a policy on another's life, so long as the policy was valid at its inception." (Id., ¶ 77.) "The crucial time period for determining the presence of insurable interest is at the inception of the policy when the policy is issued." (Id., ¶ 78.) "The Friedman Policy had insurable interest at the time it was issued." (Id., ¶ 81.) However, "Defendant has recently taken the position that other policies issued by its predecessor, Jefferson-Pilot, are void as alleged STOLI policies lacking insurable interest." (Id., ¶ 83.) "[Plaintiff'S] customer anticipates that Defendant will

11

claim that the Friedman Policy is void under New Jersey law."
(Id., ¶ 84.)

"The Roscoe Policy was issued by a Greensboro, North Carolina insurance company, acting through an agent appointed by the company to solicit and sell its policies in Wisconsin to a Suring, Wisconsin insured in 2008." (Id., ¶ 88.) "Wisconsin law applies to the parties' dispute with regard to the validity and enforceability of the Roscoe Policy as the Roscoe Policy was solicited or sold in Wisconsin and precludes any challenge to the validity of the Roscoe Policy after two years from its issuance." (Id., ¶ 92.) Yet,

> Defendant will likely assert that in light of the fraudulent conduct of the agent Kergil in producing the Roscoe Policy that its validity and enforceability is questionable and may contend that because the Roscoe Policy application indicates that it was signed in New Jersey by some of the signatories and/or that the Roscoe Trust had an address in New Jersey, New Jersey law applies and permits Defendant to challenge the Roscoe Policy.

> [Plaintiff] asserts that Wisconsin law applies to determining the Roscoe Policy's validity and enforceability and that Defendant shared this view at and after the criminal trial of Kergil, since Defendant took no action to advise [Plaintiff] of the trial and the involvement of Defendant and the Roscoe Policy in the trial.

(Id., ¶¶ 93-94 (internal paragraph numbering omitted).)

"The Roscoe Policy was issued to the Roscoe Trust insuring the life of Roscoe for $3 million." (Id., ¶ 98.) "The Roscoe Trust entered into a Credit Agreement with HM Ruby Fund, L.P[.] in

12

connection with securing a non-recourse premium financing loan for the Roscoe Policy." (Id., ¶ 100.) "Counsel for the Defendant, in representing other insurance companies, has previously taken the position that other policies funded by a loan issued by HM Ruby Fund, L.P[.] are void as alleged STOLI policies lacking insurable interest." (Id., ¶ 102.) Accordingly:

> [Plaintiff's] customer anticipates that Defendant will claim that the Roscoe Policy is void under New Jersey law and that Defendant's failure to act after the criminal trial was not because Lincoln National determined that Wisconsin law applied to the Roscoe Policy but rather because New Jersey law has permitted carriers to take advantage of policy owners and collect premium on policies that the carriers have no intention of honoring, to the detriment of policy owners.

(Id., ¶ 104.)

"The Karmi Policy was issued by a Greensboro, North Carolina insurance company, acting through an agent appointed by the company to solicit and sell its policies in New York to a Floral Park, New York insured in 2009." (Id., ¶ 108.) "The Karmi Policy was delivered to the insured either in New York, where the insured resided, or in Michigan, where the Karmi Trust had its situs." (Id., ¶ 112.) "New York or Michigan law applies to the parties' dispute with regard to the validity and enforceability of the Karmi Policy as the Karmi Policy was delivered either in New York or Michigan." (Id., ¶ 113.) However, "Defendant will likely assert that Delaware law governs the Karmi Policy's validity and enforceability on the ground that the Karmi Policy application

indicates that it was signed by some of the signatories in Delaware and/or that the Karmi Trust is governed by Delaware law." (Id., ¶ 114.) Moreover, "[t]he Karmi Trust used a non-recourse premium finance loan in connection with the Karmi Policy" (id., ¶ 121), and "Defendant has previously taken the position that life insurance policies funded by non-recourse premium finance loans are void as alleged STOLI policies lacking insurable interest (id., ¶ 123). "[Plaintiff's] customer anticipates that Defendant will claim that the Karmi Policy is void under Delaware or other law." (Id., ¶ 124.)

"The Sagan Policy was issued to the Sagan Trust insuring the life of Sagan for $10 million." (Id., ¶ 128.) "In or around November 2010, the Sagan Trust sold the Sagan Policy to Coventry First, LLC" (id., ¶ 130) and "the beneficial interest in the Sagan Policy was transferred to [Plaintiff] on behalf of its customer" (id., ¶ 131). "Defendant has previously taken the position that life insurance policies sold to Coventry First, LLC are void as alleged STOLI policies lacking insurable interest." (Id., ¶ 132.) "[Plaintiff] anticipates that Defendant will claim that the Sagan Policy is void under applicable law." (Id., ¶ 133.)

Defendant moved to dismiss the Complaint for, as relevant here, "lack of subject matter jurisdiction" pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (the "Rules").

14

(Docket Entry 10 at 1.)[4]  Plaintiff opposed the Dismissal Motion, arguing that "this Court has subject matter jurisdiction over [its] claims for declaratory relief." (Docket Entry 21 at 1.)  However, Plaintiff "decided to withdraw its claims on th[e Sagan P]olicy" (id. at 1 n.2) because, "[b]ased on further review of the four Policies identified in the original Complaint, [Plaintiff] concluded that [it] agreed" with Defendant's contention "that there is no dispute to adjudicate" as to the Sagan Policy "and accordingly undertook to drop that policy from the case" by amending its Complaint (Docket Entry 22 at 3).  Defendant opposed the Amendment Motion "because the motion's goal — the deletion of allegations pertaining to the Sagan policy, on the ground that there is no case or controversy as to that policy — can be achieved more efficiently by simply allowing [Defendant's] pending Rule 12(b)(6) motion to play out." (Docket Entry 25 at 1.)  Plaintiff thereafter "agree[d]" with that assertion, explaining that,

> [i]f the Court determines that there is a justiciable
> controversy with respect to the three remaining policies,
> the Court can fashion its Rule 12(b)(6) order in such a
> way as to give effect to Wells Fargo's wish that the

---

4    Defendant also moved to dismiss pursuant to "[Rule] 12(b)(6) for failure to state a claim" (id.) for the same reasons it moved to dismiss under Rule 12(b)(1). (See, e.g., Docket Entry 11 at 2 ("On its face, the Complaint fails to identify a live case and controversy.  Accordingly, this Court lacks subject matter jurisdiction under the Declaratory Judgment Act and Wells Fargo has failed to state a claim for relief.").) Given the lack of subject matter jurisdiction (as discussed below), this Opinion does not separately address Defendant's Rule 12(b)(6) argument.

15

Sagan policy be removed from this case, by dismissing
without prejudice the claim regarding the Sagan policy.

(Docket Entry 27 at 1 (internal quotation marks omitted).)

**DISCUSSION**

**I. Dismissal Motion**

**A. Declaratory Judgment Standards**

A federal court may exercise jurisdiction in a declaratory
judgment action only when:

> (1) the complaint alleges an "actual controversy" between
> the parties "of sufficient immediacy and reality to
> warrant issuance of a declaratory judgment;" (2) the
> court possesses an independent basis for jurisdiction
> over the parties (e.g., federal question or diversity
> jurisdiction); and (3) the court does not abuse its
> discretion in its exercise of jurisdiction.

Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d
581, 592 (4th Cir. 2004).

As relevant here, "[a] case meets the actual controversy
requirement only if it presents a controversy that qualifies as an
actual controversy under Article III of the Constitution." Id. In
other words, "before an action for a declaratory judgment may
stand, it must involve an actual controversy, a genuine dichotomy
of contention upon which specific relief may be granted." Hanes
Dye & Finishing Co. v. Caisson Corp., 309 F. Supp. 237, 240
(M.D.N.C. 1970); see also North Jefferson Square Assocs., L.P. v.
Virginia Hous. Dev. Auth., 94 F. Supp. 2d 709, 714 (E.D. Va. 2000)
("It is fundamental to the exercise of judicial powers that a
genuine case and controversy be before the Court."), aff'd, 32 F.

16

App'x 684 (4th Cir. 2002). "A 'controversy' in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot." Aetna Life Ins. Co. of Hartford v. Haworth, 300 U.S. 227, 240 (1937) (citation omitted).

As the United States Court of Appeals for the Fourth Circuit has explained, in the context of a declaratory judgment action:

> The test for a "case or controversy," the constitutional inquiry, is whether the dispute "is definite and concrete, touching the legal relations of parties having adverse legal interests." [*Id.* at] 240-41[.] "It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* The question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

White v. National Union Fire Ins. Co. of Pittsburgh, 913 F.2d 165, 167-68 (4th Cir. 1990) (parallel citations omitted).

"In the trial court, of course, a party seeking a declaratory judgment has the burden of establishing the existence of an actual case or controversy." Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 95 (1993). Further, "[a] case or controversy must exist at the time the declaratory judgment action is filed." GTE

17

Directories Publ'g Corp. v. Trimen Am., Inc., 67 F.3d 1563, 1568 (11th Cir. 1995).

## B. STOLI Background

A brief overview of STOLI matters provides helpful context for Plaintiff's claims. As the United States Supreme Court long ago explained, life insurance policies require "an insurable interest[;]" in other words, "an interest of some sort in the insured life must exist. A man cannot take out insurance on the life of a total st[r]anger, nor on that of one who is not so connected with him as to make the continuance of the life a matter of some real interest to him." Connecticut Mut. Life Ins. Co. v. Schaefer, 94 U.S. 457, 460 (1876); see also id. ("The essential thing is, that the policy shall be obtained in good faith, and not for the purpose of speculating upon the hazard of a life in which the insured has no interest."). Without an insurable interest, "the contract is a mere wager, by which the party taking the policy is directly interested in the early death of the assured. Such policies have a tendency to create a desire for the event. They are, therefore, independently of any statute on the subject, condemned, as being against public policy." Warnock v. Davis, 104 U.S. 775, 779 (1881).

"Although life insurance policies must be payable to a person with an insurable interest when they are procured, policies can be sold later on — including to individuals who would not have been

18

able to buy the policy originally because they lacked an insurable interest." Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A., 238 N.J. 157, 169, 208 A.3d 839, 846 (2019). Thus, "in response to the AIDS crisis" of the 1980s, a "viatical settlements industry was born" in which investors purchased life insurance policies from AIDS victims. Life Partners, Inc. v. Morrison, 484 F.3d 284, 287 (4th Cir. 2007).[5] As the Fourth Circuit explained:

> In the early years, AIDS was a rapidly fatal disease, and its victims usually died within months of diagnosis. Many AIDS sufferers were in great need of cash to pay for their care after they had become debilitated. Their life insurance policies were not only expensive to maintain but could, upon liquidation, provide some of the desperately needed cash. Moreover, investors were willing to purchase the life insurance policies of AIDS sufferers. Inasmuch as AIDS sufferers had predictably short life expectancies, their policies were reliable investments.

Id. "[A]s AIDS became a more treatable disease," id. at 287-88, "[t]he viatical settlements market expanded to include other terminal illnesses," id. at 287, as well as policies for "elderly people in need of funds for assisted living," id. at 288.

"Over time, and as the market expanded, the industry changed its name and description from 'viatical settlements' to 'life settlements.'" Sun Life, 238 N.J. at 171, 208 A.3d at 848 (certain

_____

5  "A 'viaticum' in ancient Rome was a purse containing money and provisions for a journey. A viatical settlement, by which a dying person is able to acquire provisions for the remainder of his life's journey by selling his life insurance policy, is thus thought to provide a viaticum." Id. "In the language of the industry, the insured is the 'viator,' who sells his policy at a discount to a 'provider' of the viaticum." Id.

internal quotation marks omitted). "STOLI policies — once again, short for stranger-originated life insurance policies — are a subset of life settlements." Id., 208 A.3d at 848.[6]

"In a traditional life settlement, investors purchase existing life insurance policies from insureds who no longer need the insurance to protect their families in the event of their deaths." Id., 208 A.3d at 848 (internal quotation marks omitted). "In a STOLI arrangement, by contrast, a life settlement broker persuades a senior citizen . . . to take out a life insurance policy — not to protect the person's family but for a cash payment or some other current benefit arranged with a life settlement company." Id., 208 A.3d at 848 (internal quotation marks omitted) (ellipsis in original). "A key 'difference between non-STOLI and STOLI policies,' as the [United States Court of Appeals for the] Second Circuit has explained, 'is simply one of timing and certainty; whereas a non-STOLI policy might someday be resold to an investor, a STOLI policy is intended for resale' before it is issued." Id., 208 A.3d at 848 (quoting United States v. Binday, 804 F.3d 558, 565

---

        6       Additional    names    for    these    policies    include
"stranger-oriented life insurance" and "investor-originated life
insurance" ("IOLI"), United States v. Binday, 804 F.3d 558, 565 &
n.2 (2d Cir. 2015) (internal quotation marks omitted), abrogated on
other grounds by Ciminelli v. United States, 598 U.S. __, 143 S.
Ct. 1121 (2023), as well as "stranger owned life insurance and
investor owned life insurance," Lincoln Nat'l Life Ins. Co. v.
Gordon R.A. Fishman Irrevocable Life Tr., 638 F. Supp. 2d 1170,
1172 (C.D. Cal. 2009) (parenthetical omitted).

(2d Cir. 2015), <u>abrogated on other grounds by</u> <u>Ciminelli v. United</u> <u>States</u>, 598 U.S. __, 143 S. Ct. 1121 (2023)).

"STOLI policies became a popular investment in the mid 2000s for hedge funds and others eager to bet that the value of a policy's death benefits would exceed the value of the required premium payments." <u>Binday</u>, 804 F.3d at 565. "In response, many insurance companies . . . adopted rules against issuing STOLI policies and took steps to detect them." <u>Id.</u> "But insurance brokers such as [Kergil and his co]defendants — who received commissions from insurers for new policies that they brokered — had a financial incentive to place STOLI policies by disguising them to the insurer as non-STOLI policies." <u>Id.</u> at 565-66. "By matching a potential insured with a STOLI investor, a broker could generate a commission on a policy that would not have been issued had the insurer known the policy's true purpose." <u>Id.</u> at 566.

"Generally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value. The investor may lend the insured the money to pay the premiums for the period of incontestability, typically two years." <u>Sun Life</u>, 238 N.J. at 171-72, 208 A.3d at 848 (internal quotation marks and citation omitted).[7] "It is also common for an insured to buy the

---

[7]    "[A]lmost all" life insurance policies contain an incontestability clause, with the "standard industry practice" providing for "a two-year period after which policies cannot be contested except for nonpayment of premiums." <u>Id.</u> at 168, 208 A.3d at 846 (internal quotation marks omitted).

policy in the name of a trust and name a spouse or other loved one as the trust beneficiary." Id. at 172, 208 A.3d at 848 (internal quotation marks omitted). Of note:

> In such arrangements, if the insured dies within the contestability period, his spouse, as beneficiary of the insurance trust, will get the death benefit (the free insurance), pay back the loan plus interest from the proceeds, and often pay the broker up to fifty percent of the benefit received. If the insured lives beyond two years or the contestability period, then the life settlement company buys the beneficial interest in the insurance trust, paying the insured a lump sum percent of the face value of the policy . . . . The life settlement company or its investors will continue to pay the premiums on the policy, and when the insured dies, they will get the death benefit. Clearly, the sooner the insured dies, the greater the company's profit.

Id., 208 A.3d at 848 (internal quotation marks and brackets omitted) (ellipsis in original).

"STOLI arrangements thus present a significant legal problem: the investors have no insurable interest in the life of the insured." Id., 208 A.3d at 848 (internal quotation marks omitted). Accordingly, by June 2019, "[t]hirty states ha[d] enacted anti-STOLI legislation." Id. at 178, 208 A.3d at 852. In addition, "[t]wo model acts have been designed to stop STOLIs. One bars any person from entering into any practice or plan which involves STOLIs. The other generally bars viatical settlement agreements for five years, instead of two." Id., 208 A.3d at 852 (internal quotation marks, brackets, and citation omitted).

However, courts have taken divergent approaches to dealing with existing STOLI policies under various states' laws. See id.

22

at 180-85, 208 A.3d at 854-56. In so doing, certain courts, including the Supreme Courts of Delaware and New Jersey, have applied a fault-based analysis to determine whether to return premiums paid on a STOLI policy deemed void ab initio. See Geronta Funding v. Brighthouse Life Ins. Co., 284 A.3d 47, 64-73 (Del. 2022) (discussing authorities and explaining that, "[a]s surveyed above, most courts have adopted a fault-based approach to this question as opposed to a general rule that the premiums must be returned to the investor"); accord Sun Life, 238 N.J. at 187-90, 208 A.3d at 857-59.

As the Delaware Supreme Court observed:

[A]pplying a nuanced fault-based test, instead of rescission, is more consistent with public policy considerations. Because insurance policies that are void as against public policy for lack of an insurable interest are frauds on the court that are unenforceable, the [c]ourt should take care to discourage these policies from coming into existence. The automatic return of premiums certainly discourages insurance companies from hiding the invalidity of a policy for as long as possible in order to continue collecting premiums. But the automatic return of premiums encourages investors to continue purchasing life insurance policies without investigation into whether those policies are unenforceable policies due to lack of an insurable interest. After all, under the best-case scenario, the investor gets paid the death benefits. Under the worst-case scenario, the investor receives the return of the premiums — other than the time value of money, the investor loses nothing in the gamble. This is despite any role it may have played in procuring the void policy or ignoring the fraud. A fault-based analysis will encourage investors to actually investigate all policies to avoid the risk of losing their premiums — a thorough investigation of insurance policies will hopefully uncover those that are void *ab initio* as against public policy. This approach should incentivize investors not

23

to procure or purchase these unenforceable policies in
the first instance.

      A fault-based analysis also incentivizes insurers to
speak up when the circumstances suggest that a policy is
void for lack of an insurable interest because they will
not be able to retain premiums if they stay silent after
being put on inquiry notice, and they might also be
responsible for interest payments.  In other words, our
test incentivizes each player along the chain of these
insurance policies to behave in good faith.

Geronta Funding, 284 A.3d at 72.

### C. Analysis

For its part, Defendant asserts that, "[o]n its face, the
Complaint fails to identify a live case and controversy," and, as
such, "this Court lacks subject matter jurisdiction under the
Declaratory Judgment Act."  (Docket Entry 11 at 2.)  Plaintiff
responds that "[Defendant's] repudiation of similar policies casts
doubt on its intentions with respect to the Policies at issue here
and that doubt rises to the level of a case or controversy."
(Docket Entry 21 at 2 (footnote omitted).)  Defendant's position
should prevail.

According to Defendant, "no actual controversy exists between
the parties.  Wells Fargo admits in its pleading that all of its
causes of action depend *per force* upon speculative legal arguments
in an unfiled hypothetical lawsuit[] . . . ."  (Docket Entry 11 at
3; see also id. at 4 (quoting allegations, including that
"Defendant *may assert*" or "*will likely assert*" or "*may contend*"

24

(emphasis in original) (quoting Docket Entry 1, ¶¶ 61, 63, 72, 84,

93, 104, 114, 124, 133).) Per Defendant:

> What is really going on here is purely tactical and does not create jurisdiction in this Court. To that end, Wells Fargo is serving as the agent for hidden investors who have purchased large life insurance policies on the lives of strangers. Those investors, acting through Wells Fargo, claim they are "concerned" about the legitimacy of their investments because, they say, their policies may have insurable interest issues. But instead of first contacting Lincoln National with their purported concerns, and instead of first asking Lincoln National its position on any of these issues, the first indication Lincoln National received about any concern or purported dispute over the Policies was after Wells Fargo filed and served this lawsuit. Clearly this is not a proper use of the Declaratory Judgment Act, which is limited to actual disputes where — before a complaint is filed — the parties have actually staked out their positions and, because of a real disagreement, it is necessary to resort to the courts for resolution of a dispute. *Sprint Commc'ns Co., L.P.*[ *v. Fairpoint Commc'ns, Inc.*, No. 3:16-cv-820], 2017 WL 2919015, at *5 [(W.D.N.C. July 7, 2017)] ("[A] controversy is not present where the defendant has not taken preliminary actions against the plaintiff nor made any indication that it plans to take future legal action against the plaintiff.")[.]

> In short, the Complaint constitutes a tactical ploy to embroil Lincoln National in litigation over Policies and purported issues that were not even brought to its attention by Wells Fargo before if filed suit. The Complaint patently fails on its face to present a live case or controversy and, therefore, is insufficient to meet the jurisdictional prerequisites of a declaratory judgment action and fails to state a claim for relief.

(Id. at 4-5 (penultimate set of brackets in original).)

In response, Plaintiff does not dispute that it failed to

communicate with Defendant about the Policies prior to filing suit.

(See generally Docket Entry 21.) Instead, Plaintiff maintains that

"[Defendant's] actions *in this case* demonstrate that there is a

25

justiciable case or controversy" (id. at 2 (emphasis in original)) because, after Plaintiff sued, it gave Defendant "documents and files related to the four insureds cited in the Complaint" that Defendant requested "in order 'to reach a decision on how to proceed in response to [Plaintiff's] complaint'" (id. at 2 n.4). In Plaintiff's view:

> Rather than going to the expense of preparing its [Dismissal] Motion — the premise of which is that nobody knows whether [Defendant] might or might not repudiate the Policies — [Defendant] could have simply written a letter saying: *this case is unnecessary because we intend to honor these Policies and pay the claims on them as and when they come due*. [Defendant's] refusal to write that letter, and to instead file its [Dismissal] Motion, speaks volumes.

(Id. at 2 (emphasis in original); see also id. at 8-9 ("But after reviewing those documents, instead [of] giving any answer as to whether it will challenge any, all or none of the Policies based on what it reviewed from [Plaintiff's] files, [Defendant] simply filed the [Dismissal] Motion. That [Defendant] has not answered these questions and has instead filed the [Dismissal] Motion further fans the flames of doubt as to its intentions.").)

Plaintiff further asserts that the Complaint alleges specific information regarding three of the Policies that, based on Defendant's litigation history, "raises questions as to whether [Defendant] will disavow those Policies" (id. at 5). (See id. at 4-6.) More specifically, Plaintiff contends:

> Here, the Complaint alleges specific information as to the origination of each Policy, including the sale of

26

the beneficial interest in the Fr[ie]dman Policy six (6) months after the policy was issued, and use of premium financing in connection with the Roscoe and Karmi Policies, all of which raises questions as to whether [Defendant] will disavow those Policies for lack of insurable interest. *See* Compl. ¶¶ 14-17, 29, 41, ECF No. 1. [Defendant] has previously alleged that the use of premium financing violates insurable interest laws, us[ing] it as a basis for refusing to pay death benefits and keeping premiums it was paid. *See Steven A. Sciaretta, as trustee of the Barton Cotton Irrevocable Tr. a/k/a the Am. and Restated Barton Cotton Irrevocable Tr. v. The Lincoln Nat'l Life Ins. Co.* (No. [9:]11-cv-80427][ S.D. Fla. Apr. 21, 2011)]. Indeed, [Defendant] has filed its own declaratory judgment actions to that effect:

- In *Lincoln National Life Insurance Company v. Eli Inzlicht-Sprei* (No. 16-cv-05171) (E.D.N.Y.), [Defendant] alleged that a policy was void because the insured used the same premium finance program used on the Roscoe Policy;

- In *The Lincoln National Life Insurance Company v. Bayard J. Snyder as Trustee of the Harry Wisner Irrevocable Life Insurance Trust* (No. 09-cv-00888) (D. Del.), [Defendant] alleged that a policy was void because the premiums were financed or funded by stranger investors;

- In *The Lincoln National Life Insurance Company v. BNC National Bank as Trustee of the Onofrio Biviano 2007 Irrevocable Trust* (No. 09-cv-82447) (S.D. Fla.), [Defendant] alleged that speculators typically pay most or all of a prospective insured's costs including premium payments;

- In *The Lincoln National Life Insurance Company v. Walter R. Calhoun* (No. 08-cv-02917) (D.N.J.), [Defendant] alleged that a stranger investor provided premium financing; and

- In *The Lincoln National Life Insurance Company v. Retirement Value LLC* (No. 21-cv-20438) (D.N.J.), [Defendant] alleges that the initial premiums paid for the life insurance policy were not funded by the insured or any person with an insurable interest in the insured's life;

27

[Defendant] has also historically argued that the law governing a life insurance policy is the law of the state where the trust-owner is located or where the policy application was signed, if those states are New Jersey or Delaware. *See* Compl. ¶¶ 58, 60, ECF No. 1. Here, the Roscoe Policy was initially owned by a New Jersey trust, the Friedman Policy application was apparently signed in New Jersey while the beneficial interest in the Friedman Policy was transferred to a Delaware trust, and the Karmi Policy application was apparently signed in Delaware. *Id.* ¶¶ 13, 17, 23, 38. As [Plaintiff] alleges, [Defendant] will challenge the Policies' validities and enforceability, as it has done with other Lincoln policies in actions nationwide, seeking to apply New Jersey or Delaware law to the Friedman, Roscoe and Karmi Policies. *See id.* ¶ 61. [Plaintiff] is entitled to ask the Court which state law applies to the Policies so that [Plaintiff's] customer may act accordingly.

(Id. (formatting in original).)

As a preliminary matter, Defendant's conduct after Plaintiff filed suit cannot establish the necessary subject matter jurisdiction for this action. For one, "[a] case or controversy must exist at the time the declaratory judgment action is filed," GTE Directories, 67 F.3d at 1568, so Defendant's (at best ambiguous) post-filing litigation strategy does not suffice to establish jurisdiction, see id. (explaining that post-suit actions "do not establish that at the time the [c]omplaint was filed an actual case or controversy existed between [the plaintiff] and [the defendant]" and that, "[t]o make that determination, [the court] must look at the facts which existed at the time [the plaintiff] filed its [c]omplaint"). For another, Defendant's decision to pursue the Dismissal Motion rather than "writ[e] a letter saying:

28

*this case is unnecessary because we intend to honor these Policies and pay the claims on them as and when they come due*" (Docket Entry 21 at 2 (emphasis in original)) neither "speaks volumes" (id.) nor "fans the flames of doubt as to its intentions" (id. at 9). Rather than signaling a nefarious intent "to lay in wait and take no action — while collecting premium[s] — and when a death claim or inquiry short of a lawsuit is made, rush to a courthouse of its choosing to seek a declaration that the policy is void" (id. at 6), Defendant's decision to seek dismissal rather than provide Plaintiff the relief it seeks at least as plausibly signals a desire to disincentivize future unnecessary litigation. In any event, Plaintiff cannot rely on the filing of the Dismissal Motion to establish subject matter jurisdiction.

Moreover, contrary to Plaintiff's contentions, the Complaint does not "allege[ that Defendant] <u>will</u> challenge the Policies' validities and enforceability, as it has done with other Lincoln [National] policies in actions nationwide, seeking to apply New Jersey or Delaware law to the Friedman, Roscoe and Karmi Policies." (<u>Id.</u> at 6 (emphasis added) (citing Docket Entry 1, ¶ 61).) As the Background section's recitation of the Complaint's allegations makes clear, Plaintiff's lawsuit relies entirely upon speculation as to positions that Defendant <u>may</u> potentially take at some unknown future date. (<u>See, e.g.</u>, Docket Entry 1, ¶ 61 ("[Plaintiff's] customers <u>anticipate</u> that Defendant will challenge the Policies'

validities and enforceability . . . ." (emphasis added)), ¶ 72 ("Defendant may assert . . . ." (emphasis added)), ¶ 93 ("Defendant will likely assert . . . and may contend . . . ." (emphasis added)), ¶ 114 ("Defendant will likely assert . . . ." (emphasis added)).) Plaintiff bases those speculative allegations on the fact that Defendant has previously challenged as STOLI other life insurance policies that share certain similarities with the Policies. (See generally Docket Entries 1, 21.) In so doing, Plaintiff relies heavily on the Inzlicht-Sprei case (Docket Entry 1, ¶ 57; Docket Entry 21 at 5), contending that Defendant, in that case, "alleged that a policy was void because the insured used the same premium finance program used on the Roscoe Policy" (Docket Entry 21 at 5).

That matter involved a $20 million, allegedly STOLI life insurance policy, financed by H.M. Ruby, L.P., as well as a New Jersey trust and a life insurance application that indicated "it was signed in New Jersey," Lincoln Nat'l Life Ins. Co. v. Inzlicht-Sprei, No. 16cv5171, 2020 WL 1536346, at *2 (E.D.N.Y. Mar. 31, 2020), aff'd, 847 F. App'x 97 (2d Cir. 2021). See id. at *1-3. Contrary to Plaintiff's assertions, however, **Defendant** did not contest the policy as STOLI; instead, after the insured died, Defendant (i) filed an interpleader action because of competing claims from Plaintiff and Inzlicht-Sprei, the insured's son, (ii) "deposited the [p]olicy proceeds with the Clerk of Court[,]

30

and [(iii)] was terminated as a party," id. at *7.  See id. at *5-7.  **Inzlicht-Sprei** argued that he "[wa]s entitled to the [p]olicy's proceeds because the [p]olicy is a [STOLI] policy."  Id. at *14; see id. at *14-16.  The court rejected that argument, noting that it "[wa]s troubled by Inzlicht-Sprei's assertion" given that "Lincoln [National] ha[d] already disbursed the [p]olicy proceeds" and "the only considerations [we]re how the proceeds, based on equitable principles, should be distributed between Inzlicht-Sprei and Wells Fargo."  Id. at *16 n.32.  "Given that it was Inzlicht-Sprei's [a]greement with [another individual] that turned the [p]olicy into a STOLI policy in the first place, the [c]ourt f[ou]nd[] it hard to believe that New Jersey public policy would countenance Inzlicht-Sprei, who ha[d] not paid a single cent towards the [p]olicy, being the beneficiary of New Jersey's prohibition on STOLI policies."  Id. (citation omitted).  Accordingly, the court awarded Plaintiff the policy proceeds and directed the disbursement of "all funds, with interest, to Wells Fargo."  Id. at *20.

Similarly, in Life Prod. Clearing, LLC v. Angel, 530 F. Supp. 2d 646 (S.D.N.Y. 2008), Defendant paid rather than attempted to repudiate an apparent STOLI policy.  In that matter, an individual took out a $10 million life insurance policy, which he "always intended to sell . . . to [LPC, an] investor for a large cash payout," id. at 650, and which he sold for $300,000 only "a few

31

days," id., after the policy issued.  See id. at 647-50.  He died
within one month of the policy's issuance and, after investigating
the situation, "[Defendant] paid the death benefit" of
"$10,712,328.77, reflecting the face value of the [p]olicy plus
interest," id. at 651, rather than suing to invalidate the policy.
See id. at 647-51.[8]

Thus, in at least two instances, Defendant has declined to
challenge arguably STOLI life insurance policies that display many
of the same allegedly problematic characteristics as the Policies.
Further, despite Plaintiff's suggestion that Defendant has only
"recently taken the position that other policies issued by its
predecessor, Jefferson-Pilot, are void as alleged STOLI policies
lacking insurable interest" (Docket Entry 1, ¶ 83), Defendant had
lodged such a challenge even prior to its decision to pay those
policies, see Lincoln Nat'l Life Ins. Co. v. Gordon R.A. Fishman
Irrevocable Life Tr., 638 F. Supp. 2d 1170, 1170-77 (C.D. Cal.
2009).  Additionally, refuting any notion that Defendant has
adopted a general practice of challenging problematic Jefferson-
Pilot policies, Defendant has recently affirmed that it either will
not challenge or has no present intent to challenge various
Jefferson-Pilot life insurance policies that raise similar STOLI

---

8  After Defendant paid the proceeds, LPC and the insured's
daughter, the personal representative of his estate, sued each
other, each seeking a declaration of entitlement to the more than
$10.7 million from Defendant.  See id. at 647-48.

concerns. See Retirement Value LLC v. Lincoln Nat'l Ins. Co., No. 3:22cv405, Docket Entry 9, ¶¶ 53-108 (N.D. Tex. May 4, 2022) (detailing policies); Retirement Value LLC v. Lincoln Nat'l Ins. Co., No. 3:22cv405, Docket Entry 11 at 5 (N.D. Tex. May 18, 2022) ("conced[ing] that [Defendant] has no intent of ever challenging the[] validity" of certain policies); Retirement Value LLC v. Lincoln Nat'l Ins. Co., No. 3:22cv405, Docket Entry 27 at 1 (N.D. Tex. July 21, 2022) (dismissing claims as to relevant policies for "lack of actual controversy"); Retirement Value LLC v. Lincoln Nat'l Ins. Co., No. 3:22cv405, Docket Entry 34 at 1-3 (N.D. Tex. Jan. 31, 2023) (dismissing for lack of actual case or controversy claims involving remaining policies, as to which Defendant represented it lacked facts establishing that those policies qualified as STOLI and lacked present intent to challenge such policies for lack of insurable interest).[9]

Under the circumstances, the Complaint fails to establish that Defendant will challenge the Policies.[10] Accordingly, the Complaint does not support the conclusion that Defendant has taken a legal position adverse to Plaintiff regarding the Policies.

---

9  Defendant filed a copy of the last-cited order in support of the Dismissal Motion. (See Docket Entry 26-1.)

10  This conclusion appears particularly true for the Roscoe Policy, as to which the Complaint asserts that Defendant "shared [Plaintiff's] view" regarding the applicability of Wisconsin law "at and after the criminal trial of Kergil" (Docket Entry 1, ¶ 94) without offering any basis upon which to conclude that Defendant has changed its alleged earlier position.

In sum, Plaintiff has not met its "burden of establishing the existence of an actual case or controversy," <u>Cardinal Chem.</u>, 508 U.S. at 95, as required for maintaining a declaratory judgment action, <u>see</u> <u>White</u>, 913 F.2d at 167-68.  Put another way, "[n]ot only do[es the Complaint] rely on a potential determination that these Policies are STOLI that may not occur, [the Complaint does not] indicat[e] that Lincoln [National] is more likely to challenge these Policies as STOLI than any other life insurance policy it has issued." (Docket Entry 26-1 at 4.)  "As a result, there is no case or controversy pending before the Court, and the Court lacks subject matter jurisdiction." (<u>Id.</u>)  The Court therefore should grant the Dismissal Motion.

## II. Amendment Motion

By the time it filed the Amendment Motion, Plaintiff could amend the Complaint "only with [Defendant's] written consent or the [C]ourt's leave." Fed. R. Civ. P. 15(a)(2).  Under Rule 15, "the [C]ourt should freely give leave [to amend] when justice so requires." <u>Id.</u>  Thus, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." <u>Johnson v. Oroweat Foods Co.</u>, 785 F.2d 503, 509 (4th Cir. 1986).  A proposed amendment qualifies as futile if it cannot withstand a motion to dismiss. <u>See</u> <u>Perkins v. United States</u>, 55 F.3d 910, 917 (4th Cir. 1995).

34

Plaintiff seeks to amend its Complaint to drop "its claims on th[e Sagan P]olicy" (Docket Entry 21 at 1 n.2) because, after "further review of the four Policies identified in the original Complaint, [Plaintiff] concluded that [it] agreed" with Defendant's contention "that there is no dispute to adjudicate" as to the Sagan Policy (Docket Entry 22 at 3). (See Docket Entry 23-1 (proposed amended complaint); see also Docket Entry 23-2 (redline of proposed changes).) Merely omitting the Sagan Policy allegations from the Complaint will not cure the lack of subject matter jurisdiction. Accordingly, Plaintiff's proposed amended complaint remains subject to dismissal under Rule 12(b)(1), rendering the proposed amendment futile. The Court will therefore deny the Amendment Motion. See, e.g., Carrero v. Farrelly, 310 F. Supp. 3d 542, 545–50 (D. Md. 2018) (denying leave to amend where proposed amendments failed to confer jurisdiction, rendering proposed pleading subject to Rule 12(b)(1) dismissal and thus futile).

## CONCLUSION

Plaintiff failed to establish subject matter jurisdiction, and its proposed amended complaint does not cure that deficiency.

**IT IS THEREFORE RECOMMENDED** that the Dismissal Motion (Docket Entry 10) be granted.

35

**IT IS FURTHER ORDERED** that the Amendment Motion (Docket Entry 22) is **DENIED.**

This 28th day of July, 2023.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
